**Ernest RILEY, Plaintiff,**

v.

**Margaret HECKLER,\* Secretary of Health and Human Services, Defendant.**

**No. C–1–82–933.**

United States District Court, S.D. Ohio, W.D.

April 19, 1984.

---

\* The only proper defendant in this action is the Secretary of Health and Human Services, Margaret Heckler. Fed.R.Civ.P. 25(d)(1). Accordingly, Margaret Heckler should be substituted as defendant Secretary in place of Richard S. Schweiker, and no further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Act, 42 U.S.C. § 405(g).

R. Gregory Park, Legal Aid Soc., Cincinnati, Ohio, for plaintiff.

Joseph E. Kane, Asst. U.S. Atty., Columbus, Ohio, for defendant.

## OPINION AND ORDER

SPIEGEL, District Judge:

Plaintiff brought this action under 42 U.S.C. § 405(g) seeking review of the Secretary's decision finding that plaintiff is not disabled and denying plaintiff's claim for Supplemental Security Income (SSI) benefits. The parties have filed cross-motions for summary judgment supported by supplemental memoranda (docs. 9 and 10) so the case is ripe for decision. S.D.Ohio R. 3.5.2. The motions for summary judgment are hereby overruled because the case is here for general judicial review.

Plaintiff filed a claim for SSI benefits on March 3, 1981 alleging that he became disabled in November, 1979 at the age of forty-two. He asserts that he is disabled as the result of multiple impairments including chronic alcoholism, a severe breathing impairment, and back and hip pain.

His claim was denied initially and upon reconsideration.

An Administrative Law Judge (ALJ) before whom plaintiff appeared, along with a paralegal, considered the case *de novo* and on March 23, 1982 ruled that plaintiff was not under a disability which would entitle him to SSI benefits. That decision became the final decision of the Secretary when the Appeals Council denied plaintiff's request for review on July 20, 1982.

Plaintiff, who is now forty-six, has a sixth grade education. He worked for fifteen years as a journeyman carpenter. His vocational report indicates that beginning in 1979 he worked from four to five days a week rather than the regular five-day week he had worked up to that point. With the exception of one day in 1980, plaintiff has not worked since November, 1979 (tr. 93).

In the disability report which the plaintiff submitted in March, 1981 he stated that he was suffering from paralytic arthritis of his right foot, a shorter right leg, a crooked spine, asthma and bronchial conditions, and alcoholic seizures. He stated that he had had five such seizures in the preceding three years each of which caused him to blackout (tr. 78). He further alleged that in 1973 he started doing lighter carpentry work which involved less lifting because of back pain (tr. 79). He further reported that he had been treated as an outpatient at the Cincinnati Veterans Administration (VA) Hospital in 1980 and 1981 (tr. 79).

Plaintiff is alleging disability as a result of a combination of impairments, the most serious of which is his chronic alcoholism. He has submitted several medical reports in support of his claim for disability. In addition, the record includes a report from Dr. Philip Harber, an otologist, who examined plaintiff at the request of the Social Security Administration (SSA) in April, 1981. These reports will be briefly summarized.

The impairment involving his right leg and foot has its origin in an automobile accident in 1972 in which he fractured his leg (tr. 107). Plaintiff was hospitalized for five weeks and as a result of the fracture has a right leg which is slightly shorter than the left. He wears a special shoe to compensate (tr. 119).

Evidence with respect to his breathing disabilities appears in the records of a 1979 hospitalization at the VA Hospital (tr. 137). While in the emergency room for evaluation for abdominal pain and diarrhea, plaintiff suffered a grand mal tonic clonic seizure lasting from three to five minutes after which he was admitted for further studies. In the course of this hospitalization, plaintiff was examined for chronic bronchitis. It was noted that he had been a heavy smoker for twenty years (tr. 138) with a history of chronic cough which had exacerbated prior to admission (tr. 139). The arterial blood gas on admission revealed mild hypoxemia. Patient was placed on Aminophyllin and given a bronkometer and inhaler for use at home. He was also begun on Ampicillin. Plaintiff was diagnosed as having probable underlying chronic obstructive pulmonary disease (tr. 139). Pulmonary function testing demonstrated severe obstructive defect with hyperinflation, maldistribution of inspired air and resting hypoxemia (tr. 132).

Additional breathing studies were done in April, 1981 as part of the examination ordered by the SSA in conjunction with plaintiff's SSI claim (tr. 125). That test shows a pre-bronchodilator FEV (1.0) of 1.10 and an MVV of 51.96. The response after the bronchodilator was significantly improved. The breathing tests were interpreted as demonstrating severe airway obstruction with a demonstrable bronchodilator response.

The records of the 1979 hospitalization describe plaintiff as a chronic alcoholic, noting that plaintiff admitted to drinking approximately one fifth of whiskey a day (tr. 137). The neurologist who saw the plaintiff in consultation concluded that the most likely etiology of the seizure plaintiff experienced in the emergency room was secondary to alcohol withdrawal as plaintiff had stated that he had not had a drink for four days. He was treated with Valium and had no further seizures during the hospitaliza-

tion. Plaintiff was discharged with a diagnosis of seizure disorder probably secondary to alcohol withdrawal; chronic alcohol abuse; probable gastroenteritis, probable chronic bronchitis, and proteinuria. This last problem appears to have resolved itself during the hospitalization, as it was concluded that further investigation was not necessary (tr. 139). Plaintiff was discharged with no limitations on his activities and given prescriptions for Aminophyllin and Ampicillin.

In September, 1981 the plaintiff stated that he had had two seizures in August of that year for which he had been treated at the VA Hospital as an outpatient (tr. 104, 108). Plaintiff also states that in June, 1980 he was treated at the VA Hospital in Dayton for an alcohol seizure (tr. 106).

Plaintiff entered the outpatient Alcohol Dependence Treatment Program (ADTP) at the Cincinnati VA Hospital August 4, 1981 (tr. 127). On September 8, 1981 plaintiff was admitted as an ADTP inpatient (tr. 129, 133–36). During this twenty-eight day therapy plaintiff engaged in AA meetings, group therapy and one-on-one counseling, and was placed on Antabuse. The discharge diagnosis was alcoholism and chronic obstructive lung disease. The plaintiff was discharged on Antabuse, Theo-Dur, and a Bronkometer, with instructions to follow-up with AA and as an ADTP outpatient. The prognosis was favorable, and no limitations were placed on plaintiff's activities (tr. 129). An elaborate after-care program was designed for the plaintiff with his participation. That program involved four AA meetings a week, a monthly sobriety group meeting at the VA Hospital, vocational counseling and monthly monitoring of the Antabuse therapy (tr. 133–35). Although the discharge summary states that the plaintiff could return to work it also notes that plaintiff has no employment prospects (tr. 134).

Plaintiff was seen in April, 1981 at the request of the SSA by Dr. Philip Harber, an otologist (tr. 119–21). Dr. Harber observed that low back pain is triggered by prolonged standing or walking. Plaintiff was being treated with Darvocet and Nyproxen. Dr. Harber observed that the plaintiff's limited ability to climb stairs was the result of dyspnea rather than back pain. He further reported that plaintiff stated that he had had right knee pain since 1972 and occasional swelling (tr. 119).

Dr. Harber noted that plaintiff reported drinking from one-half to three-fourths of a fifth of whiskey each day and withdrawal symptoms if he stops drinking for more than two days. Plaintiff denied a history of blackouts although he did state that he had had four seizures since 1968, the most recent in May, 1980. Dr. Harber noted that plaintiff had had progressive dyspnea since 1973 and now becomes dyspneic after climbing six steps or walking one block. Use of the inhalor improves any wheezing within twenty minutes. Plaintiff has never been hospitalized for asthma. He has smoked two packs of cigarettes per day since the age of eleven (tr. 119–20).

Based upon the plaintiff's history, physical exam and laboratory findings, Dr. Harber summarized plaintiff's multiple problems:

First, he has significant airway obstructive disease. His examination is most consistent with a diagnosis of emphysema, but the pulmonary function tests do reveal a component of reversible bronchial spasms. It is therefore suggested that he is not receiving optimal medical therapy. The spirometery test results are consistent with the level of symptoms he reports. In addition, he has low back pain of significant degree and clearly has a significant skeletal abnormality which would account for the shortening of the right leg and the pelvic tilt when walking. This may be related to the hip [alleged pain] problem. There is no clinical evidence of cervical and/or lumbar nerve root compression. His mental status shows intact functioning, and I believe he is likely to be able to manage any benefits granted (assuming that he does not become excessively intoxicated). He has a history of alcohol abuse with probably [sic] liver disease (the history is

very suggestive of him having had alcoholic hepatitis rather than cirrhosis in the past), hematemosis (cause uncertain) alcohol withdrawal seizures and other withdrawal symptoms. (tr. 121).

Plaintiff appeared before an ALJ in January, 1982. The paralegal who represented plaintiff at that hearing, asked that the ALJ order a psychological examination (tr. 66). That request was denied because the ALJ believed that such an examination had been done at the VA Hospital (tr. 66, 68). The paralegal renewed the request in January, 1982 after reviewing the VA Hospital records and discovered no record that plaintiff had ever been given a psychological examination (tr. 131). No such examination was ordered because the ALJ concluded that the evidence did not warrant such an examination (tr. 14).

Plaintiff testified that he can read and write with some limitations, that he has a ten percent service disability of his right foot and that he can drive but does not own a car (tr. 30–34). He agreed that his prior work as a journeyman carpenter was skilled. Incarcerated for five years in Texas from 1973 to 1977, plaintiff was on parole at the time of the hearing. He testified that this incarceration was the result of an alcohol related crime and that while in the penitentiary he worked for three or four weeks as a carpenter but was then put on permanent disability (tr. 36, 37).

The plaintiff stated he had both asthma and emphysema for which he used a bronkometer. He acknowledged that he was a heavy smoker and had been advised to stop but that he had been unsuccessful in doing so (tr. 37–41). He further testified that he suffered hip and lower back pain (tr. 41–44).

Plaintiff does wood carvings when sober (tr. 48–50). He also watches television and drinks with his buddies (tr. 50). In response to a series of questions by the ALJ, the plaintiff testified that he had never done any work with furniture such as refinishing, stripping, or repairing and that his prior work as a carpenter involved heavy construction (tr. 50–52). The plaintiff testified that he collected unemployment benefits in 1979 and 1980, but has not received benefits since March, 1980 when they ran out.

A large part of the hearing was devoted to plaintiff's alcoholism. Plaintiff was eight years old the first time he got drunk, and began drinking seriously in 1964. He drinks every day if possible, although on occasion he abstains three or four days (tr. 64). His longest period of sobriety was while he was in the penitentiary in Texas, but even then he occasionally managed to find something to drink (tr. 61, 44). He also abstained for the twenty-nine days he was enrolled in the VA's ADTP in the fall of 1981 (tr. 61). Upon release from prison in 1977, plaintiff drank at the airport bar and on the plane back to Ohio (tr. 46). Ten days after being discharged from ADTP, plaintiff quit taking the Antabuse, and began drinking. Two weeks later, he returned to taking Antabuse, but again followed the program for only two weeks, after which he started to drink again (tr. 45). He had not been to AA meetings for over a month (tr. 61, 55).

Plaintiff testified that he had been hospitalized seven times for alcoholism and that he had suffered six alcoholic seizures. His first seizure was in 1969 at which time he was hospitalized in Middletown, Ohio for five weeks, and told for the first time that he was an alcoholic and had cirrhosis of the liver (tr. 62). In 1970 he went to Texas where he was hospitalized for five months after he began to bleed internally. He stated that the physicians were unable to discover what was wrong with him. After being released, he began drinking heavily again (tr. 62–63). His second alcoholic seizure was in 1973, shortly after he was incarcerated in Texas. The third one apparently occurred sometime in 1978 after he was released from prison. Plaintiff testified that he suffered two alcoholic seizures in 1979 and two in 1980 (tr. 63–64). Plaintiff was, however, a little confused

about the precise dates of the latter seizures.

Plaintiff acknowledged that he had been able to work despite his alcoholism but added that he drank quite a bit on the job (tr. 44). He was never fired for drinking because it was the union's practice to lay off anyone caught drinking so that he could draw unemployment (tr. 66).

Plaintiff was arrested in April of 1980 for drunk and disorderly conduct and fined by a Mayor's Court. In early 1981 he was convicted of driving under the influence. He was incarcerated for eight days and his license was suspended for thirty days (tr. 47).

Plaintiff also testified that he had tried to stop drinking several times either on his own or with the help of Alcoholics Anonymous and "religion and hospitals" (tr. 65–66). Plaintiff has a drink the first thing every morning after getting up (tr. 57). He drinks whatever he can find, whiskey, beer or wine (tr. 57), primarily through bumming drinks from his friends (tr. 59–60). Plaintiff testified that before coming to the hearing, which began at 10:08 in the morning (tr. 27), he had consumed a fifth of wine and a beer (tr. 57).

The paralegal asked that the record be kept open so that she could submit additional records from the VA Hospital (tr. 67). The ALJ agreed, adding that he was not interested in historical evidence but only in plaintiff's condition since approximately mid-March of 1980. The ALJ reasoned that up until March of 1980 the plaintiff was either working or drawing unemployment and that by drawing unemployment plaintiff had certified that he was able to work (tr. 68).

After reviewing the evidence and the testimony, the ALJ concluded that plaintiff was not disabled. The ALJ found that the record demonstrated a history of alcoholism, emphysema and low back pain (tr. 14). A psychological examination had not been ordered because the ALJ concluded that the records, including Dr. Harber's observation that plaintiff's mental status was intact and the absence of any reference to psychological problems in Dr. Harber's report, did not indicate that such an examination was necessary. The ALJ also noted that the 1981 ADTP discharge summary stated that plaintiff could resume pre-hospital employment. Based upon this evidence, the ALJ concluded that plaintiff's impairments were not severe enough to interfere with the ability to work (tr. 14). He also found that the alcoholic seizures were not severe enough to preclude work, noting that plaintiff had suffered only a few seizures since 1969 and none in some years (tr. 14).

The ALJ accepted that plaintiff could not return to his prior work, but found plaintiff had the residual functional capacity for a wide range of sedentary work so long as the work was in a clean environment. He pointed out that plaintiff is a younger individual with a limited education, had engaged in semi-skilled work, and has transferable skills and the residual functional capacity for sedentary work. The ALJ concluded that Rule 201.26, App. 2, Reg. No. 16, Subpart I directed a finding of not disabled. The ALJ added that even if plaintiff's prior work was unskilled or his skills were not transferable, he would nevertheless be found not disabled. Rules 201.24, 201.25, App. 2, Reg. No. 16, Subpart I (tr. 15–16). Finally, the ALJ stated that he did not fully accept plaintiff's claims of pain and of his symptoms in lieu of the medical and other evidence (tr. 16).

We find that the ALJ's conclusion that plaintiff is not disabled is not supported by substantial evidence. First, although he acknowledged that plaintiff bases his claim on a combination of impairments, the ALJ found plaintiff not disabled by concluding that plaintiff is capable of sedentary work and then mechanically applying the medical-vocational guidelines. The breathing impairment and alcoholism, however, are both non-exertional limitations, and, therefore, the grid may not be used to dictate a finding of not disabled. *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 528–29 (6th Cir. 1981). Instead full consideration must be

given to all the facts concerning the individual plaintiff. Rule 200.00(e)(2), App. 2, Reg. No. 16, Subpart I.

The leg and hip pain does not preclude sedentary work as the ALJ concluded. If there were no other impairment the plaintiff would clearly be not disabled regardless of whether his prior work was skilled, unskilled or semi-skilled and of the transferability of those skills. Rules 201.24–201.26, App. 2, Reg. No. 16, Subpart I. The evidence demonstrates that plaintiff's residual functional capacity to perform sedentary work is only slightly impaired by his breathing difficulties, so long as that work can be done in a clean environment.

■ However, plaintiff also alleges disability as a result of alcoholism. Even if the ALJ determined the degree to which plaintiff's alcoholism further restricted his capacity for substantial gainful employment as he is required to do, Rule 200.-00(e)(2), App. 2, Reg. No. 16, Subpart I, the ALJ had already concluded that the plaintiff's alcoholism was not severe enough to interfere with his capacity for work. There is no evidence to support that conclusion.

■ It is well-settled that chronic alcoholism, alone or in combination, can be disabling. Proof of end organ damage or cirrhosis of the liver is not required. Where there is evidence of alcohol abuse, the Secretary must examine whether the plaintiff is so addicted to alcohol that he has lost his ability to control its use. *Gerst v. Secretary of Health and Human Services*, 709 F.2d 1075, 1078 (6th Cir.1983); *Cannon v. Harris*, 651 F.2d 513, 519–20 (7th Cir.1981); *Ferguson v. Schweiker*, 641 F.2d 243, 248–49 (5th Cir.1981); *Johnson v. Harris*, 625 F.2d 311, 313 (9th Cir.1980). This rule applies even where the plaintiff has not alleged disability based on alcoholism. *Osborne v. Cohen*, 409 F.2d 37, 39 (6th Cir.1969); *Cannon*, 651 F.2d at 519.

■ Plaintiff's representative asked the ALJ to order a psychological examination of her client. That request was refused. Given the substantial evidence of alcoholism, the exam should have been ordered for purposes of determining whether plaintiff had lost the ability to control his use of alcohol. Nevertheless, based on the evidence before us we conclude that such an examination is not essential to our decision as the record is replete with evidence that plaintiff cannot control his addiction.

Although plaintiff was discharged from the VA's Alcohol Dependence Treatment Program in October, 1981 with a good prognosis and detailed aftercare plan (tr. 129, 133–36), he testified without contradiction that within ten days he had stopped taking Antabuse and had returned to drinking. He also testified that after two weeks of drinking he attempted to go back to the aftercare plan but was successful for only a brief period. He had been drinking prior to the hearing. The evidence also established that even though he was forced into a period of abstinence (more or less) during his Texas incarceration he resumed his drinking immediately upon release.

That plaintiff voluntarily enrolled in the VA's program in 1981 is evidence of a desire to control his addiction. That he was successful as an inpatient in that program and discharged with a positive prognosis, however, is scarcely proof of his ability to control his addiction. *See Ferguson*, 641 F.2d at 249. Plaintiff's return to drinking suggests that whatever the success of the detoxification program, it had not resolved the underlying disease. Indeed, the very elaborateness of the aftercare program indicates how critical follow-up care and community support was to plaintiff's ultimate success. Under these circumstances, the positive prognosis is entitled to minimal weight. That plaintiff was able to work for a number of years despite his alcoholism does not change our conclusion that beginning in November, 1979, he has been unable to control his drinking. Common sense tells us that the effect of ten years of chronic alcoholism on one's ability to work is not as severe as the effect of fifteen or twenty years of alcoholism.

The ALJ discounted plaintiff's claims of alcoholic seizures, stating that plaintiff has

suffered only a few seizures since 1969 and no seizures in some years (tr. 14). That statement overlooks that plaintiff's testimony and the medical records demonstrate that most of the seizures have occurred since 1978 (tr. 63–64, 104, 106, 108, 137–38).

Further, the consultative report from Dr. Philip Harber, corroborates plaintiff's claims of disability (tr. 119–125). Although he did not address the question of whether plaintiff could control his drinking, Dr. Harber does describe the long history of alcoholism, the excessive amount ingested by plaintiff each day, the seizures and the probable cirrhosis. Although Dr. Harber stated that plaintiff's mental status was intact, that statement was based upon Dr. Harber's interchanges with the plaintiff during the examination and the taking of the history. Dr. Harber is not a psychologist and was not asked to do a psychological examination. We conclude, therefore, that his statement as to plaintiff's intact mental functioning is not evidence of plaintiff's ability to control his drinking. Furthermore, Dr. Harber stated that plaintiff should be able to manage any benefits granted, but added parenthetically "assuming that plaintiff does not become excessively intoxicated" (tr. 121). This parenthetical comment suggests that Dr. Harber believed plaintiff would continue to drink in the future as he had in the past.

It was incumbent upon the Secretary to examine whether or not plaintiff's chronic alcoholism had progressed to the degree that he could no longer control his drinking. That examination was not done. Nevertheless, the record contains substantial uncontradicted evidence that the plaintiff no longer has the ability to control his consumption of alcohol and accordingly must be found disabled.

The ALJ indicated at the hearing that even if plaintiff were disabled, the period of disability should begin in March, 1980 rather than November, 1979 (tr. 67–68) because plaintiff had drawn unemployment benefits until the later date. However, mere receipt of unemployment insurance benefits does not prove ability to work. *Kinsella v. Schweiker*, 708 F.2d 1058, 1066 (6th Cir.1983), Swygert, J. dissenting, citing *Lackey v. Celebrezze*, 349 F.2d 76, 79 (4th Cir.1965); *Flores v. HEW*, 465 F.Supp. 317, 322–24 (S.D.N.Y.1978). We find that plaintiff is entitled to an award of past-due benefits beginning in November, 1979.

Finally, the SSA physician Dr. Harber stated that plaintiff could handle benefits should they be awarded and assuming that he did not become too intoxicated. In addition, we are troubled by plaintiff's statement that he drinks whatever he can bum. We fear that an award of SSI benefits will only exacerbate his alcoholism. As the Third Circuit has observed, awarding disability compensation where the effect is to exacerbate the disability is a questionable benefit. *McShea v. Schweiker*, 700 F.2d 117, 119 (3d Cir.1983). The Court went on, however, to point out that regulations governing the award of SSI benefits provide procedures whereby this result might be avoided:

> An alcoholic may be referred to treatment, 20 C.F.R. § 416.1720 (1982), and payments may be withheld if the claimant does not cooperate. *id.* § 416.1725 (1982).[1] The considerations to be used in determining whether treatment is required are set out at sections 416.935–939. Moreover, SSI payments for the benefit of an alcoholic may be made to a representative payee, including an institution caring for the claimant. *Id.* § 416.601(a)(2) (1982). Enforcing these regulations should result in the benefits being applied to their intended use—support for the individual, rather than for his destructive habit.

700 F.2d at 119. Given these procedural safeguards, we conclude that an award of benefits to the plaintiff will not be detrimental to his condition.

Having concluded that the ALJ's conclusion that plaintiff is not disabled is not supported by substantial evidence, we find

---

**1.** The 1983 regulations are identical to the 1982 regulations referred to.

that the ALJ must be and hereby is reversed. This matter is remanded to the Secretary for a determination and award of past due benefits. Such an award, however, must include provisions that the plaintiff cooperate in treatments to which he is referred. Moreover, past due benefits are to be paid to a representative payee deemed appropriate by the Secretary under all of the circumstances of this case.

This matter is remanded for further proceedings consistent with this opinion.

SO ORDERED.